USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  1/26/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
RAYMOND WANG,                                          :
                                                                      :
                              Plaintiff,                     :
                    -v.-                                        :         15-CV-9376 (PAE) (JLC)
                                                                      :
SOCIÉTÉ DU FIGARO S.A.,                            :
NAMESHIELD, and ANNE MORIN,                 :
                                                                      :
                              Defendants.                  :
--------------------------------------------------------------X


# REPORT & RECOMMENDATION

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ........................................................................................ 1

    A. The Parties ................................................................................ 1

    B. Procedural History .................................................................... 2

    C. Factual Allegations ................................................................... 5

II. DISCUSSION ...................................................................................... 11

    A. Standard to Establish Damages and Equitable Relief on Default ........ 11

    B. Alleged Anticybersquatting Consumer Protection Act Violations ........ 12

        1. Cybersquatting Under 15 U.S.C. § 1125(d)(1) ............................. 13

            a. Legal Standard ......................................................... 13

            b. Application ................................................................ 14

        2. Reverse Domain-Name Hijacking ................................................ 16

            a. Reverse Domain-Name Hijacking Under § 1114(2)(D)(v) .... 17

                i. Legal Standard ........................................................ 17

                 ii. Application ............................................................... 20

            b. Reverse Domain-Name Hijacking Under § 1114(2)(D)(iv) ... 32

                i. Legal Standard ........................................................ 32

                 ii. Application ............................................................... 33

    C. Relief ....................................................................................... 35

        1. Equitable Relief ......................................................................... 35

            a. Declaratory Relief ..................................................... 37

            b. Injunctive Relief ....................................................... 38

i

2.      Monetary Relief ............................................................................. 42

III.    CONCLUSION ..................................................................................... 44

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Paul A. Engelmayer, United States District Judge:**

*Pro se* plaintiff Raymond Wang brought this action seeking monetary, declaratory, and injunctive relief for claims of cybersquatting and reverse domain-name hijacking under the Anticybersquatting Consumer Protection Act.  On December 29, 2016, default judgment was entered against defendants.  This matter was then referred to me to conduct an inquest into damages and for a report and recommendation as to all forms of relief sought by Wang.  Both Wang and defendants (who appeared after the default judgment was entered) have submitted papers regarding the relief, if any, to which Wang is entitled.  For the reasons below, I recommend that Wang be awarded limited declaratory relief, but no injunctive or monetary relief.

## I.  <u>BACKGROUND</u>

### A.  The Parties

Plaintiff Raymond Wang, who is proceeding *pro se* and *in forma pauperis*, is a resident of Manhattan.  Complaint, dated Nov. 26, 2015, Dkt. No. 2 ("Compl."), ¶ 1; Order Granting IFP Application, dated Dec. 2, 2015, Dkt. No. 3.  By his own account, Wang is "a regular patron of the arts in the New York City area" and "a fan" of the 1786 Mozart opera *Le nozze di Figaro* (*The Marriage of Figaro*).  Compl. ¶¶ 12–13.  In September 2015, Wang registered the domain name <lefigaro.news>, which is the subject of this action.  *Id.* ¶ 8.

Defendant Société du Figaro S.A. is a French corporation (*société anonyme*, abbreviated "S.A.") headquartered in Paris.  Defendants' Proposed Findings of Fact and Conclusions of Law, dated Feb. 23, 2017, Dkt. No. 29 ("Defs.' Findings") at 1 ¶ 1.[1]  Société du Figaro owns and publishes the French newspaper *Le Figaro*, which defendants describe as France's "premier daily general-interest newspaper," noting that its website <www.lefigaro.fr> receives approximately 18 million monthly visitors.  *Id.* at 1–2 ¶¶ 1, 5, 7.  Société du Figaro owns several trademarks that include the words "Le Figaro" and more than 200 domain names that include variations on the terms "Le Figaro" or "Figaro."  *Id.* at 2–3 ¶¶ 6–7.

Defendant Nameshield, another French corporation headquartered in Paris, is a "rights-management vendor."  *Id.* at 1 ¶ 2.  Société du Figaro "engaged" Nameshield to help protect its trademark rights.  *Id.* at 1 ¶ 2; 3 ¶¶ 8–9.  Among other things, Nameshield represented Société du Figaro in trademark-related arbitration, including proceedings under the Uniform Domain-Name Dispute-Resolution Policy ("UDRP").  *Id.* at 3 ¶ 9.  Defendant Ann Morin is a French citizen and domiciliary who is employed by Nameshield as "a legal counsel (*juriste*)."  *Id.* at 2 ¶ 3.

## B.   Procedural History

Wang commenced this action by filing a complaint on November 30, 2015.  *See* Compl., Dkt. No. 2.  In his complaint, Wang seeks a "declaration of lawful use of

---

[1] Because defendants' proposed findings of fact and conclusions of law contain two sets of paragraph numbers, pinpoint citations to this submission include both page and paragraph numbers.

the domain name, injunctive relief prohibiting the transfer of the domain name to the defendants, and for damages caused by defendants' reverse hijacking." Compl. ¶ 2. After defendants agreed to accept service by mail rather than through France's Ministry of Justice, the Clerk of Court mailed a copy of the summons and complaint to defendants on March 4, 2016. *See* Docket entries dated Mar. 4, 2016.[2]

As of June 27, 2016, defendants had not appeared in this action or responded to the complaint. Accordingly, Wang moved for a default judgment against defendants. Memorandum of Law in Support of Judgment by Default, dated June 27, 2016, Dkt. No. 15 ("Pl.'s Mem."). Defendants were ordered to file any opposition to Wang's motion by August 1, 2016. Order, dated June 28, 2016, Dkt. No. 16.

Defendants had not submitted any opposition papers as of December 29, 2016. Therefore, default judgment was entered against them as to liability at that time. Order, dated Dec. 29, 2016, Dkt. No. 18. This case was then referred to me to conduct an inquest into damages and for a report and recommendation as to whether there was a "sound and persuasive basis for the other relief" sought by

---

[2] Defendants agreed to accept service by mail through Marie-Pauline Leleu, a Nameshield employee who represented that she was counsel for defendants. Declaration of Marion Courtier, dated Feb. 23, 2017, Dkt. No. 29-1 ("Defs.' Decl."), ¶ 6; Order dated Feb. 19, 2016, Dkt. No. 9. Because Ms. Leleu indicated that defendants would accept service by mail, the mailing of the summons and complaint by the Clerk was "deemed good and sufficient service." Order, dated Mar. 2, 2016, Dkt. No. 10; Order, dated Dec. 29, 2016, Dkt. No. 18, at 3 n.2. In their inquest submissions, defendants note that Ms. Leleu is merely a "legal assistant," not an attorney. Defs.' Findings at 8 ¶¶ 34, 36. Nevertheless, defendants do not deny that they agreed to accept service by mail or otherwise contest the way service was effectuated. *Id.* at 12 ¶ 5 (noting that "defendants do not contest the Court's entrance of a default judgment on liability").

3

Wang.  *Id.* at 6; Order of Reference, dated Dec. 29, 2016, Dkt. No. 19.  The Court

subsequently ordered Wang to file proposed findings of fact and conclusions of law

by February 2, 2017, and directed defendants to file any opposition by February 23,

2017.  Order, dated Jan. 4, 2017, Dkt. No. 20.

    Wang timely filed proposed findings of fact and conclusions of law on

February 2, 2017.  Proposed Findings of Fact and Conclusions of Law, dated Jan.

29, 2016, Dkt. No. 22 ("Pl.'s Findings").[3]  Though defendants had not previously

appeared in this action, each defendant filed a notice of appearance through counsel

between February 6, and 22, 2017.  Dkt. Nos. 24–25, 27–28.  On February 23, 2017,

defendants timely filed proposed findings of fact and conclusions of law of their own

and a supporting declaration.  Although defendants do not contest the entry of

default judgment against them as to liability, they argue that all forms of relief

requested by Wang should be denied.  Defs.' Findings at 12 ¶¶ 4–5.[4]

    After granting an extension, the Court permitted Wang to file reply papers by

March 31, 2017.  Dkt. No. 33.  In a supplemental order, the Court directed Wang to

ensure that any factual allegations contained in his reply papers be presented in a

---

[3] Due to an apparent typographical error, this submission is dated January 29, 2016, not 2017.

[4] While conceding liability, defendants offer a detailed explanation for their belated appearance in this action.  Defs.' Findings at 8–11 ¶¶ 33–54.  In short, Société du Figaro's officers believed that this lawsuit was "merely an appeal of the UDRP arbitral panel's decision, and that [defendant] Nameshield was handling the appeal."  *Id.* at 8 ¶ 35.  Meanwhile, Nameshield's staff seemingly thought that no response was required in this action because Wang's complaint had not yet become "'official.'"  *Id.* at 8 ¶ 34.

sworn declaration or affidavit.  Order, dated Mar. 28, 2017, Dkt. No. 34.  The Court

further noted that he had not sworn to the allegations included in his prior

submissions.  *Id.*  Wang proceeded to file reply papers dated March 31, 2017, as well

as affidavits attesting to the factual allegations contained in his complaint,

proposed findings of fact and conclusions of law, and a supporting memorandum of

law.  *See* Reply to Defendants' Proposed Findings of Fact and Conclusions of Law,

dated Mar. 31, 2017, Dkt. No. 36 ("Pl.'s Reply"); Affidavits, dated Mar. 31, 2017,

Dkt. Nos. 35, 37–38.

## C.     Factual Allegations

On September 10, 2015, Wang registered the domain name <lefigaro.news>

with the domain-name registrar Name.com.  Compl. ¶¶ 8–9.[5]  Wang affirms that he

registered the <lefigaro.news> domain for purposes of creating "a general

performance arts news and opera blog."  Compl. ¶ 12.  Wang states that he chose

---

[5] "Web pages are designated by an address called a domain name.  A domain name
consists of two parts: a top level domain and a secondary level domain.  The top
level domain is the domain name's suffix"—such as ".edu for educational
institutions" or ".com for commercial users."  *Sporty's Farm L.L.C. v. Sportsman's
Mkt., Inc.*, 202 F.3d 489, 492 (2d Cir. 2000).  "The secondary level domain is the
remainder of the address, and can consist of combinations of letters, numbers, and
some typographical symbols."  *Id.*  For "example, in the domain name 'cnn.com,' cnn
. . . represents the secondary level domain and .com represents the top level domain.
Each domain name is unique."  *Id.* at 492–93.

"The domain name system is administered by the Internet Corporation for
Assigned Names and Numbers ('ICANN')."  *Stephens v. Trump Org. LLC*, 205 F.
Supp. 3d 305, 308 (E.D.N.Y. 2016).  "A domain name 'registrar' is one of several
entities licensed by . . . ICANN . . . to grant domain names to applicants, or
'registrants.'"  *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 296 n.2 (2d Cir. 2002).
"Name.com is an ICANN-accredited domain name registrar."  *See* Name.com
homepage, www.name.com (last visited Jan. 23, 2018).

this particular domain name as a tribute to Mozart's 1786 opera *Le nozze di Figaro*, which was scheduled for performances at the Metropolitan Opera in New York City for the 2015–2016 season. *Id.* ¶¶ 12–13; Pl.'s Mem. at 2; Pl.'s Reply ¶ 15.

On September 29, 2015, defendant Nameshield, on behalf of defendant Société du Figaro, commenced a UDRP arbitral proceeding against Wang in the Czech Arbitration Court. UDRP Panel Decision, Defs.' Decl. Ex. I, Dkt. No. 29-10 ("Panel Decision"), at 1.[6] In its UDRP complaint, Société du Figaro argued that the domain name <lefigaro.news> was identical to its "LE FIGARO" trademark. UDRP Complaint, Defs.' Decl. Ex. R, Ex. No. 29-19, at 1. Société du Figaro also noted that it had registered several variants of its "Le Figaro" mark and that its newspaper *Le Figaro* dated back to 1826. *Id.* According to Société du Figaro, Wang had no rights

---

[6] The UDRP "is incorporated into all domain-name registration agreements." *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 540 (4th Cir. 2004). Thus, by registering <lefigaro.news> with Name.com, Wang agreed to the UDRP. *See* "Dispute Policy," Name.com, www.name.com/policies/dispute (last visited Jan. 23, 2018) ("This Uniform Domain Name Dispute Resolution Policy [UDRP] has been adopted by the Internet Corporation for Assigned Names and Numbers ('ICANN'), [and] is incorporated by reference into your Registration Agreement . . . .").

"The UDRP process has been described as 'adjudication lite' because the proceedings are handled entirely upon written submissions and the arbitration panel has total discretion to determine the application of precedent and rules of evidence." *Gen. Media Commc'ns, Inc. v. Crazy Troll, LLC*, No. 06-CV-4051 (LAK) (FM), 2007 WL 102988, at *4 (S.D.N.Y. Jan. 16, 2007) (citation omitted). The Prague-based Czech Arbitration Court, a self-described not-for-profit organization, is one of five dispute-resolution providers currently approved by ICANN. "About the Czech Arbitration Court," Czech Arbitration Court, http://udrp.adr.eu/about_us/who_we_are.php (last visited Jan. 23, 2018); "List of Approved Dispute Resolution Service Providers," ICANN.org, www.icann.org/resources/pages/providers-6d-2012-02-25-en (last visited Jan. 23, 2018).

or legitimate interests in the domain name, and Wang was using the domain name in bad faith.  *Id.* at 2.

In response, Wang represented that he was a "social blogger" who registered <lefigaro.news> "for a personal blog for art and theatre enthusiasts, especially for opera fans of [Mozart's] 'Le nozze di Figaro.'"  Panel Decision at 3.[7]  Wang also argued that "Le Figaro" is a "generic dictionary word" meaning "the barber" and that "'millions of places, streets, people, and businesses' have been named after the opera."  *Id.*  Wang challenged the notion that the newspaper *Le Figaro* was founded in 1826, contending that Société du Figaro's "incorporation documents" indicated that Société du Figaro was established in 1954.  *Id.*  Additionally, Wang depicted *Le Figaro* as a "small time newspaper" with a print circulation of only 408,361—failing to surpass "the Instagram account of Kim Kardashian, which [was] said to have some 20 Million" followers.  *Id.* at 4.  Finally, Wang accused Société du Figaro of "attempting to engage in reverse domain name hijacking."  *Id.*

When the UDRP proceeding commenced, <lefigaro.news> was devoid of content.  Panel Decision at 6; Defs.' Findings at 3 ¶ 12.  On October 14, 2015, however, five days before filing his response to Société du Figaro's complaint in the UDRP proceeding, Wang added a blog post to his website that read as follows:

> Hello Opera fans of Le nozze di Figaro!  After some surprising hiccups the long awaited blog site is finally here.  I will try to post as much as possible and keep everyone updated with the latest!

---

[7] Wang's responsive papers in the UDRP proceeding are not part of the present record, though the Panel Decision summarizes his arguments, and Wang has not disputed the accuracy of the summary.

> First things first, the very first original original [*sic*] Figaro was a gentleman named Francesco Benucci, who sang many of Mozart's characters in his long career.  Benucci rose to fame for his song "Non piu andrai, farfallone amoroso," and was known for his strong, deep powerful voice that impressed Mozart.
>
> For those of you who are in town in NY for the holiday season, and as some of you know the Metropolitan Opera is in session with Otello, Tannhauser, and Tosca!

Panel Decision at 2; Compl., Ex. 1.  Wang took a screenshot of his website three minutes after adding this post and submitted it to the UDRP panel for consideration.  Panel Decision at 3–4.

The UDRP panel issued a decision dated November 9, 2015, finding that Wang had "no right or legitimate interests in the Domain Name and the Domain Name had been registered and used in bad faith."  *Id.* at 7.  The panel determined that <lefigaro.news> was "undoubtedly 'confusingly similar'" to the "Le Figaro" mark.  *Id.* at 4.  The panel concluded that it was more likely than not that Wang had registered the domain name "to take some form of unfair advantage of its actual and potential associations with [Société du Figaro's] business and marks"— not "with any reference to Mozart in mind."  *Id.* at 5, 7.  Regarding Wang's screenshot of the blog post, the panel concluded that this evidence appeared to have "been manufactured after [the] proceedings . . . commenced . . . to substantiate [Wang's] claims."  *Id.* at 6.  For these reasons, the panel directed that the domain name <lefigaro.news> be transferred to Société du Figaro.  *Id.* at 7.

The parties dispute whether the UDRP panel's order was effectuated such that <lefigaro.news> was actually transferred from Wang to Société du Figaro.

Citing an email from a Name.com representative to a Nameshield legal assistant (Ms. Leleu), defendants assert that the domain name had been scheduled to be transferred on November 30, 2015, but that, before the transfer took place, Name.com placed <lefigaro.news> in a "Compliance Lock" pending the resolution of this lawsuit.  Defs.' Findings at 7 ¶ 31 (citing Email, dated Dec. 5, 2015, Defs.' Decl. Ex. S, Dkt. No. 29-20).  According to defendants, the "'Compliance Lock' prevented the transfer of the domain."  *Id.* at ¶ 32.  As Wang notes, however, the very email that defendants cite for their position appears to contradict it, confirming instead that the transfer took place and that the "Compliance Lock" went into effect afterwards.  Pl.'s Reply ¶ 9; Email, dated Dec. 5, 2015, Defs.' Decl. Ex. S, Dkt. No. 29-20 (email from Name.com representative stating that the "domain has been transferred to the Name.com account you provided to us").

In their papers, defendants submitted evidence that <lefigaro.news> is currently inoperative and has been available for purchase since September 10, 2016—one year after Wang first registered the domain name.  Defs.' Findings at 4 ¶¶ 15–16.  Defendants attributed the inoperative status to Wang's failure to renew his registration, but Wang counters that he could not renew it because the domain name was in Société du Figaro's control as a result of the UDRP panel's transfer order and that defendants were responsible for allowing the registration to lapse. *Id.*; Pl.'s Reply ¶¶ 7–9.  Wang further represents that, if the Court so permits, he would "be happy to buy it again."  Pl.'s Reply ¶ 7.

Defendants supplemented their proposed findings and conclusions by letter dated August 3, 2017, in which they reported to the Court that on July 10, 2017, an individual named Thomas Lextrait—who to defendants' knowledge is not affiliated with any of the parties—registered the "lefigaro.news" domain name.  Letter to the Court dated Aug. 3, 2017 (Dkt. No. 39), & Ex. A.  Defendants contend that Lextrait's registration "demonstrates that 'lefigaro.news' had previously been publicly available and Mr. Wang failed to reregister it when it became available." *Id*.  They add that the Lextrait registration further establishes that they have not renewed or derived any profit from the domain.  *Id*.

Wang responded to defendants' letter concerning the Lextrait registration by letter dated August 7, 2017 (Dkt. No. 40), in which he argued that whether Lextrait (or anyone else) registered the domain is irrelevant to the issues presented in this case, and that this dispute is "about the defendants' successful domain hijacking by abusing the UDRP process."[8]

---

[8] The parties have not addressed the question of whether at least some of the relief sought is now moot to the extent that neither party currently owns the domain name and it has been registered by someone else.  Moreover, neither party has explained what transpired from when Name.com allegedly transferred the domain name to Société du Figaro to when the Lextrait registration took place (and whether either party made any further efforts to register the domain name).  Nonetheless, given that both parties had an interest in the domain name at one time, may have such an interest again, and given that the UDRP panel decision seems likely to interfere with Wang's ability ever to reacquire it, the controversy between the parties still appears to be a live one.  *Cf. Mailplanet.com, Inc. v. Lo Monaco Hogar, S.L.*, 291 F. App'x 229, 232 (11th Cir. 2008) (litigation brought by registrant seeking declaratory judgment and permanent injunctive relief regarding registration of Internet domain name was moot when trademark owner decided to concede ownership of domain name and to forgo its request for transfer of domain name from registrant).

## II.   <u>DISCUSSION</u>

### A.   Standard to Establish Damages and Equitable Relief on Default

"Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true.  The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citation omitted).  To establish damages upon default, plaintiffs must demonstrate that the "compensation sought relate[s] to the damages that naturally flow from the injuries pleaded."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992).  Additionally, a "court may 'issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction."  *Garis v. Uncut-RawTV, Inc.*, No. 06-CV-5031 (ADS) (AKT), 2011 WL 4404035, at *3 (E.D.N.Y. July 5, 2011), *adopted by*, 2011 WL 4404032 (E.D.N.Y. Sept. 21, 2011) (internal quotation marks omitted).

"In determining damages not susceptible to simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence."  *Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*, No. 11-CV-5980 (RA) (JLC), 2013 WL 5977440, at *5 (S.D.N.Y. Nov. 12, 2013), *adopted by*, 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014) (internal quotation marks

11

omitted).  The Second Circuit has long approved the process of conducting an

inquest by affidavit, without an in-person court hearing, "as long as [the court has]

ensured that there was a basis for the damages specified in the default judgment."

*Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d

Cir. 1997) (quoting *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir.

1989)).  The Court concludes here that "a hearing is not necessary, as documents

submitted in this action provide a 'sufficient basis from which to evaluate the

fairness' of the damages" and other relief requested.  *Am. Jewish Comm. v. Berman*,

No. 15-CV-5983 (LAK) (JLC), 2016 WL 3365313, at *4 (S.D.N.Y. June 15, 2016)

(quoting *Fustok*, 873 F.2d at 40), *adopted by*, 2016 WL 4532201 (S.D.N.Y. Aug. 29,

2016).

## B.    Alleged Anticybersquatting Consumer Protection Act Violations

Wang seeks monetary, injunctive, and declaratory relief on the ground that

defendants are liable for "cybersquatting" and "reverse domain name hijacking" in

violation of the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No.

106–113, 113 Stat. 1501 (1999) (codified in scattered sections of Title 15 of the

United States Code).  Pl. Mem. at 6–9; Compl. ¶¶ 37–53, "Wherefore" clause ¶ A–I.

The Court reviews each ground for relief below and recommends that Wang not

receive any relief for his cybersquatting claim, but that he receive limited

declaratory relief for one of his two claims of reverse domain-name hijacking.[9]  The

Court also recommends that no monetary damages be awarded.

### 1.     Cybersquatting Under 15 U.S.C. § 1125(d)(1)

#### a.     Legal Standard

In 1999, Congress amended the Lanham Act with the ACPA "to protect

consumers and holders of distinctive trademarks from 'cybersquatting.'" *Webadviso*

*v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. 2011).  "Cybersquatting involves

the registration as domain names of well-known trademarks by non-trademark

holders who then try to sell the names back to the trademark owners."  *Sporty's*

*Farm*, 202 F.3d at 493.  The ACPA sought "to provide clarity in the law for

trademark owners by prohibiting the bad-faith and abusive registration of

distinctive marks as Internet domain names with the intent to profit from the

---

[9] Where a defendant has defaulted, "a court is required to accept all of the
[plaintiff's] factual allegations as true and draw all reasonable inferences in its
favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). Nonetheless, "the
default establishes [a defendant's] liability [only] as long as the complaint has
stated a valid cause of action." *Kuruwa v. Meyers*, 823 F. Supp. 2d 253, 256
(S.D.N.Y. 2011), *aff'd*, 512 F. App'x 45 (2d Cir. 2013) (citations omitted); *see also*
Fed. R. Civ. P. 55(b)(2). "In other words, even after a default, 'it remains for the
court to consider whether the unchallenged facts constitute a legitimate cause of
action, since a party in default does not admit conclusions of law.' " *Johnson &*
*Johnson v. Azam Int'l Trading*, No. 07-CV-4302 (SLT) (SMG), 2013 WL 4048295, at
*8 (E.D.N.Y. Aug. 9, 2013) (quoting *Labarbera v. ASTC Labs., Inc.*, 752 F. Supp. 2d
263, 270 (E.D.N.Y. 2010)); *see also Taizhou Zhongneng Imp. & Exp. Co. v.*
*Koutsobinas*, 509 F. App'x 54, 56 (2d Cir. 2013) (defaulting defendant's liability
depends on whether "allegations are sufficient to state a cause of action").

goodwill associated with such marks." *Id.* at 495 (quoting S. Rep. No. 106–140, at 4).

To this end, the ACPA created a cause of action to allow trademark owners to seek redress against domain-name registrants. *See* 15 U.S.C. § 1125(d). As relevant here, the statutory prohibition on cybersquatting reads as follows:

> A person shall be liable in a civil action by the owner of a mark . . . if . . . that person-- (i) has a bad faith intent to profit from that mark . . . and (ii) registers, traffics in, or uses a domain name that--(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or] (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark[.]

15 U.S.C. § 1125(d)(1)(A). A plaintiff bringing such a claim is eligible to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Further, in lieu of actual damages, "the plaintiff may elect . . . to recover . . . an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d).

### b.   Application

Wang argues that this action is "clearly a case involving 15 U.S.C. § 1125(d)(1)" and, thus, he is entitled to statutory damages. Pl.'s Mem. at 9. Wang appears to misunderstand that § 1125(d)(1) allows trademark owners to seek redress against domain-name registrants, not the reverse. To prevail on a cybersquatting claim under 15 U.S.C. § 1125(d)(1), plaintiffs must establish:

14

"(1) Defendants registered, trafficked in or used a domain name; (2) that was identical or confusingly similar to Plaintiffs' mark; (3) Plaintiffs' mark, at the time Defendants registered their domain name, was distinctive; and (4) Defendants committed these acts with a bad faith intent to profit from Plaintiffs' mark." *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 214 (E.D.N.Y. 2009) (citing 15 U.S.C. § 1125(d)(1)(A)).

Here, Wang has not pleaded facts to establish at least three of these elements. Specifically, he has not alleged that he owns a mark—much less a "distinctive" (or "famous") mark within the meaning of the ACPA. Consequently, he cannot establish the third element. *See* 15 U.S.C. § 1125(d)(1) (making registrant liable to "the owner of a mark"); *optionsXpress, Inc. v. optionsXpress Inc.*, No. 14-CV-956 (PKC), 2014 WL 3728637, at *3 (S.D.N.Y. July 28, 2014) ("To prevail on a claim of cybersquatting under 15 U.S.C. § 1125(d), a plaintiff must own a famous or distinctive mark . . . ."). Additionally, Wang has not established that defendants had a "bad faith intent to profit" from any mark owned by him, which precludes him from establishing the fourth element. 15 U.S.C. § 1125(d)(1)(A)(i). Further, Wang does not allege that defendants registered or used a domain name that is "identical or confusingly similar to" any mark of his, which prevents him from establishing the second element. 15 U.S.C. § 1125(d)(1)(A)(ii)(I)–(II). For these reasons, Wang has failed to establish a cybersquatting claim, which precludes him from recovering under 15 U.S.C. § 1117(a) or (d). *See Camowraps, LLC v. Quantum Digital Ventures LLC*, 74 F. Supp. 3d 730, 741, n.43 (E.D. La. 2015) ("Although [15 U.S.C.

15

§ 1117] authorizes statutory damages for cases involving . . . bad-faith registration
of a domain name, *see* 15 U.S.C. §§ 1117(d), 1125(d)), plaintiff does not explain how
those provisions could apply to this case.").

### 2.    Reverse Domain-Name Hijacking

As discussed above, the ACPA allows trademark owners to seek redress
against domain-name registrants.  However, "to balance the rights given to
trademark owners against cybersquatters, the ACPA also provides some protection
to domain name registrants against 'overreaching trademark owners.'"
*Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 625
(4th Cir. 2003) (quoting S. Rep. No. 106–140, at 11).  Specifically, the ACPA
authorizes domain-name registrants to sue trademark owners for "reverse domain
name hijacking."  *See, e.g.*, *Gen. Media*, 2007 WL 102988, at *7.  Reverse domain-
name hijacking is the practice by which "trademark owners abusively assert their
trademark rights to strip domain names from rightful owners."  *Sallen v.
Corinthians Licenciamentos LTDA*, 273 F.3d 14, 17 (1st Cir. 2001).

The ACPA "contains two provisions relevant to . . . reverse domain name
hijacking"—15 U.S.C. § 1114(2)(D)(iv) and (v).  *Gen. Media*, 2007 WL 102988, at *7.
As discussed below, subsection (v) of this statutory provision allows domain-name
registrants to sue trademark owners who deprive them of domain names when the
registration or use of the domain names are not in fact unlawful under the ACPA.
15 U.S.C. § 1114(2)(D)(v).  Under subsection (iv), domain-name registrants may
seek recovery against trademark owners who deprive them of domain names by

means of knowing and material misrepresentations.  15 U.S.C. § 1114(2)(D)(iv).  For the reasons explained below, the Court finds that Wang is eligible for relief under subsection (v), but not subsection (iv).

### a.    Reverse Domain-Name Hijacking Under § 1114(2)(D)(v)

### i.    Legal Standard

A domain-name registrant can sue a trademark owner under 15 U.S.C. § 1114(2)(D)(v) if the trademark owner causes a domain name to be "suspended, disabled, or transferred" as long as the domain-name registrant's registration and use of the domain name was "not unlawful" under the ACPA.  15 U.S.C. § 1114(2)(D)(v).  In relevant part, subsection (v) of this statutory provision reads as follows:

> A domain name registrant whose domain name has been suspended, disabled, or transferred under a [reasonable] policy . . . may . . . file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter.  The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(v).

Three phrases from subsection (v) warrant discussion.  First, to succeed on a claim of reverse domain-name hijacking under this subsection, the domain-name registrant's registration and use of the domain name cannot be "unlawful under this *chapter*."  15 U.S.C. § 1114(2)(D)(v) (emphasis added).  Unlike the codified statutory language quoted here, the original legislative enactment states that the registration and use of the domain name cannot be "unlawful under this *Act*."  *See* 113 Stat.

17

1501, § 3003 (emphasis added).  Courts are divided on the question of whether the phrases "this chapter" and "this Act" refer to the ACPA, or to the entire Lanham Act.  The Second Circuit has "assume[d]" without deciding that the phrase refers to the ACPA only, while acknowledging the Fourth Circuit's contrary interpretation. *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 382 n.9 (2d Cir. 2003) (citing *Barcelona.com*, 330 F.3d at 627–28 & n.2.  Here, defendants have argued only that Wang's registration and use of the domain name ran afoul of the ACPA's cybersquatting provision, not any other provision of the Lanham Act.  *See infra* at 22 & n.12.  Consequently, the issue is academic and, like the Second Circuit in *Storey*, the Court may assume without deciding that the phrase refers only to the ACPA.

Second, given that subsection (v) applies only to a "domain name registrant whose domain name has been suspended, disabled, or transferred," 15 U.S.C. § 1114(2)(D)(v), the "text of the statute could be read to" create "a cause of action only after the domain name has been transferred." *Storey*, 347 F.3d at 383 n.11. The Second Circuit has determined, however, that "§ 1114(2)(D)(v) encompasses situations in which a UDRP panel has ruled against a domain name and has ordered transfer or deactivation, but in which the order has not yet been implemented[.]" *Id.*  Consequently, although the parties dispute whether the UDRP panel's transfer order was effectuated, Wang may seek relief pursuant to subsection (v) regardless of whether the transfer took effect.

18

Third, subsection (v) provides a cause of action to domain-name registrants whose domain name is transferred or suspended pursuant to a "reasonable policy." 15 U.S.C. § 1114(2)(D)(v).[10]  Courts have interpreted the phrase "reasonable policy" to include the UDRP.  *See, e.g.*, *Storey,* 347 F.3d at 382 (noting that parties did not dispute that the UDRP was a "reasonable policy" within the meaning of the statute); *Barcelona.com*, 330 F.3d at 625 (defining "reasonable policy" to include UDRP); *Stephens*, 205 F. Supp. 3d at 308–09 (same).

In effect, under subsection (v), a domain-name registrant whose domain name is ordered to be transferred pursuant to a UDRP decision may seek redress against the trademark owner who initiated the UDRP proceeding—provided that the domain-name registrant's "registration or use of the domain name" was "not unlawful" under the ACPA.  15 U.S.C. § 1114(2)(D)(v); *see Sallen*, 273 F.3d at 27 ("Under § 1114(2)(D)(v), Congress has provided registrants . . . with an affirmative cause of action to recover domain names lost in UDRP proceedings.").

When adjudicating § 1114(2)(D)(v) claims, courts give no deference to the UDRP panel's decision.  *See, e.g.*, *Barcelona.com*, 330 F.3d at 626 ("[A]ny decision made by a panel under the UDRP is . . . not given any deference under the ACPA.") (emphasis omitted); *Gen. Media*, 2007 WL 102988, at *4 ("The UDRP decisions are not binding on the courts.  Indeed, the UDRP expressly contemplates independent judicial review of UDRP decisions.") (citations omitted).  Instead, a claim "brought

---

[10] To be precise, subsection (v) incorporates subsection (ii)(II), which refers to the implementation of a "reasonable policy."

under § 1114(2)(D)(v) . . . is independent of, and involves neither appellate-like review of nor deference to, the underlying [UDRP] proceeding." *Storey*, 347 F.3d at 382 (quoting *Hawes v. Network Sols., Inc.*, 337 F.3d 377, 386 (4th Cir. 2003)); *see also Sallen*, 273 F.3d at 26 ("[T]he UDRP clearly contemplates judicial intervention and, in fact, that the judicial outcome will override the UDRP one."). A court's "declaration of compliance with the ACPA" simply "trumps the panel's finding of noncompliance with the UDRP." *Sallen*, 273 F.3d at 27.

By filing a UDRP complaint, the trademark owner "submit[s], with respect to any challenges to a decision in the administrative proceeding canceling or transferring the domain name, to the jurisdiction of the courts" corresponding with the "domain-name holder's address." Rules for UDRP ¶ 3(b)(xiii), ICANN.org, www.icann.org/resources/pages/rules-be-2012-02-25-en (last visited Jan. 23, 2018). Accordingly, federal courts apply § 1114(2)(D)(v) with equal force to foreign defendants. *See, e.g.*, *Barcelona.com,* 330 F.3d at 626–29; *Hawes*, 337 F.3d at 383–87. In the words of the First Circuit, "[i]t would be very odd if Congress, which was well aware of the international nature of trademark disputes, protected Americans against reverse domain name hijacking only when a registered American mark owner was doing the hijacking." *Sallen*, 273 F.3d at 24 (footnote omitted).

### ii.    Application

Wang argues that he is entitled to relief under 15 U.S.C. § 1114(2)(D)(v) because defendants obtained a UDRP panel order directing the transfer of <lefigaro.news>, even though his registration and use of the domain name complied

with the ACPA.  Compl. ¶¶ 2, 5, 45.[11]  To prevail on a claim of reverse domain-name hijacking under this statutory subsection, "a plaintiff must establish (1) that [he] is a domain name registrant; (2) that [his] domain name was suspended, disabled, or transferred under a policy [such as the UDRP]; (3) that the owner of the mark that prompted the domain name to be suspended, disabled, or transferred has notice of the action by service or otherwise; and (4) that the plaintiff's registration or use of the domain name is not unlawful under the" ACPA.  *Alsoy v. Çiçeksepeti Internet Hizmetleri Anonim Sirketi*, 232 F. Supp. 3d 613, 621 (D. Del. 2017) (quoting *Barcelona.com*, 330 F.3d at 626).

Defendants appear to concede the first three elements, but they dispute the fourth, contending that Wang violated the ACPA's prohibition on cybersquatting. *See* 15 U.S.C. § 1125(d)(1); Defs.' Findings at 15–16, ¶¶ 15–18.[12]  To determine whether a party is liable for cybersquatting, "'courts in the Second Circuit consider (1) whether the mark is distinctive or famous; (2) whether the domain name is identical or 'confusingly similar' to the mark; and (3) whether the domain name registrant acted with a 'bad faith intent to profit' from the mark when it registered

---

[11] Wang's complaint contains two sets of paragraphs one and two; the citation to paragraph two here refers to the first one.  *See* Compl. 1–2.

[12] Defendants do not cite the statutory provision that they claim Wang violated, but they argue that Wang cannot demonstrate his compliance with two elements of 15 U.S.C. § 1125(d)(1).  *See* Defs.' Findings at 15 ¶ 15.  In making this argument, defendants cite *Strong Coll. Students Moving Inc. v. Coll. Hunks Hauling Junk Franchising LLC*, No. 12-CV-1156, 2015 WL 12602438, at *8 (D. Ariz. May 15, 2015), wherein the court analyzed whether the plaintiff had violated 15 U.S.C. § 1125(d)(1).  *Id.*

the domain name." *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 323 (S.D.N.Y. 2015) (quoting *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 472 (E.D.N.Y. 2009)) (internal alterations omitted).

Concerning the first element, though their inquest submissions hardly address the issue, defendants have submitted evidence demonstrating that the "Le Figaro" mark has been registered with the U.S. Patent and Trademark Office since 1953. Defs.' Decl., Ex. E, Dkt. No. 29-6. "As a rule, a registered trademark is presumed to be distinctive." *Alpha Recycling, Inc. v. Crosby*, No. 14-CV-5015 (JPO), 2016 WL 1178774, at *3 (S.D.N.Y. Mar. 23, 2016). Consequently, the first element appears to be satisfied.

Regarding the second element, though defendants say little about this topic, it appears that the domain name <lefigaro.news> is identical or confusingly similar to the "Le Figaro" mark.[13] This domain name is composed of "Le Figaro" as one word with the top-level domain ".news" at the end. However, "[r]egistration of domain names that constitute slight variations of a registered mark, including domain names that differ by one or two characters, often satisfies the requirement of confusing similarity." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 430 n.6 (S.D.N.Y. 2013). Further, a top-level domain (here, ".news") does not serve to distinguish a domain name from a mark. *See, e.g.*, *Web-adviso v. Trump*, 927 F.

---

[13] Defendants' silence on this subject may owe to the fact that the order entering default judgment provided that "defendants cannot preclude Wang from use of the disputed domain name on the grounds that it is confusingly similar to marks in which they may own rights." Order, dated Dec. 29, 2016, Dkt. No. 18.

Supp. 2d 32, 41 n.4 (E.D.N.Y. 2013), *aff'd sub nom. Yung v. Trump*, 648 F. App'x 24

(2d Cir. 2016).  Consequently, the second element appears to be met here.

According to Wang, "le figaro" is a "generic" term that means "barber" in

English.  Pl.'s Findings, Ex. 1, ¶ 11.  Wang's point appears to be that such "common

. . . generic dictionary words" are ineligible for trademark protection.  *Id.*; *see*

Compl. ¶ 18 (asserting that "any trademarks" that defendants "claim to hold are in

violation of federal law"); *see, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.

763, 768 (1992) ("Marks are often classified in categories of generally increasing

distinctiveness[:] . . . (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5)

fanciful."); *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005)

(noting that generic trademarks "are not at all distinctive" and "are not protectable

under any circumstances").  Yet Wang overlooks the fact that a "word may be

generic of some things and not of others." *Lifeguard Licensing Corp. v. Kozak*, No.

15-CV-8459 (LGS) (JCF), 2017 WL 908199, at *3 (S.D.N.Y. Mar. 7, 2017) (quoting

*Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 147 (2d Cir. 1997)).  For

example, "'Ivory' would be generic" and not protectable "when used to describe a

product made from the tusks of elephants but arbitrary" but protectable "as applied

to soap." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 n.6 (2d Cir.

1976).  To the extent that "le figaro" is a generic term that translates into "barber"

(a proposition for which Wang cites no authority), the term would arguably be

ineligible for trademark protection in the haircutting business but eligible for

protection in the media realm.  *See Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175

F.3d 266, 270 (2d Cir. 1999) ("Generic terms are not eligible for protection as trademarks . . . . The same rule applies when the word designates the product in a language other than English.").  For these reasons, Wang's argument is unpersuasive and the <lefigaro.news> domain name appears to be identical or confusingly similar to a distinctive mark owned by defendant Société du Figaro.

Although the first two elements appear to be met, the Court does not reach any firm conclusions on these issues, as the parties have not seriously addressed these questions in their submissions.  Moreover, the question of whether these two elements are satisfied is academic in light of the Court's determination below that the third element is unmet, which is itself sufficient to establish that Wang's registration and use of <lefigaro.com> was not unlawful under the ACPA.

To satisfy the third element of a cybersquatting claim, the domain-name registrant must have had a "bad faith intent to profit" from the mark.  15 U.S.C. § 1125(d)(1)(A)(i).  "The ACPA is not an all-purpose tool designed to allow the holders of distinctive marks the opportunity to acquire any domain name confusingly similar to their marks."  *Gioconda*, 941 F. Supp. 2d at 437.  Thus, even if a party registers a domain name that is identical or confusingly similar to a distinctive or famous mark, he is only liable if he has a "bad faith intent to profit" from the mark.  15 U.S.C. § 1125(d)(1)(A)(i).  "The requirement of bad faith intent to profit imposes an important limit that cabins the statute's scope and ensures that the ACPA targets only the specific evils that Congress sought to prevent." *Gioconda*, 941 F. Supp. 2d at 437.

The ACPA enumerates a non-exhaustive list of nine factors that "a court may consider" when making the bad-faith inquiry:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i). "A leading treatise on the law of trademarks notes that '[t]he first four factors suggest circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the mark, the next four tend to indicate that such bad faith does exist and the last factor points in either direction, depending on the degree of distinctiveness and fame of the mark.'" *Gioconda*, 941 F. Supp. 2d at 432 (quoting 4 McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed.)).

Because these nine factors are non-exhaustive and because consideration of them is not expressly mandated, courts have not mechanically applied the factors but have instead taken a "case-specific approach to bad faith." *Id.* at 433. "[A] court must analyze each case based on its unique circumstances to determine how close a [party's] conduct falls to the ACPA's heartland—the clearest example of which is the situation where a [party] registers an established entity's domain name in bad faith and offers to sell it to the entity for an exorbitant price." *New World Sols.*, 150 F. Supp. 3d at 325 (quoting *Gench v. HostGator.com LLC*, No. 14-CV-3592 (RA) (GWG), 2015 WL 569154, at *7 (S.D.N.Y. Feb. 11, 2015)). "Another 'quintessential example' of bad faith is 'where a [party] intends to profit by diverting customers from the website of the trademark owner to the [party's] own website, where those customers would purchase the [party's] products or services.'" *Id.* (quoting *Gioconda*, 941 F. Supp. 2d at 434) (internal alterations omitted). "In cases that

vary too much from the specific evil contemplated by the ACPA . . . some courts have looked skeptically at claims of bad faith." *Gioconda*, 941 F. Supp. 2d at 434 (collecting cases).

Here, as discussed below, not all of the nine enumerated factors weigh in Wang's favor, but the present record is simply devoid of evidence that Wang registered or used <lefigaro.news> with a "bad faith intent to profit." 15 U.S.C. § 1125(d)(1)(A)(i). Wang, a self-described "patron of the arts," has attested to the fact that he registered the domain name to start an "arts news and opera blog." Compl. ¶¶ 12–13.[14] As an admirer of *Le nozze di Figaro*, he declares that he named the blog after this famous Mozart opera, which was scheduled to be performed locally around the time that he registered the domain name. Compl. ¶¶ 12–13. Wang affirms that he "neither knows French nor has any personal or business relationships with France or anyone located in France." *Id.* ¶ 15. He "does not solicit or engage in outbound domain sales." *Id.* ¶ 14. Nor does he "send outbound emails, call third parties, or initiate any other outbound communication in regards to the selling of a domain." *Id.* Defendants have submitted no evidence to contradict these assertions, or to otherwise demonstrate that Wang sought to profit in bad faith from any mark owned by defendants.

---

[14] As explained above, although Wang did not initially swear to the allegations included in his complaint, proposed findings of fact and conclusions of law, and supporting memorandum of law, he later submitted affidavits swearing to the facts alleged therein. Dkt. Nos. 35, 37–38.

In arguing that Wang violated the ACPA's prohibition on cybersquatting, defendants rely heavily on the UDRP panel's decision.  Defs.' Findings at 15–16 ¶¶ 16, 18.  As the Court reads that decision, the panel's finding of bad faith was based on three factors.  First, Wang's website was left blank until after the UDRP proceedings commenced.  Panel Decision at 6.  Second, when Wang added content to his website during the course of the UDRP proceeding, he added only "a single simple post" and never "supplemented or updated" it.  *Id.*  Third, Wang took a screenshot of his website "a mere 3 minutes after the post was made," which led the panel to believe that his blog post was nothing more than "manufactured" evidence meant to substantiate his claims.  *Id.*  For these reasons, the UDRP panel concluded that, "on the balance of probabilities," it was "more plausible" that Wang registered the domain name to "take some form of" unspecified "unfair advantage" of Société du Figaro than "for an opera related blog."  *Id.*  Defendants argue that there "is no basis for reaching a different conclusion" here.  Defs.' Findings at 15 ¶ 16.

The Court finds defendants' argument unconvincing.  As an initial matter, UDRP panel decisions receive no deference in judicial proceedings like this one. *See, e.g.*, *Storey*, 347 F.3d at 382–83.  Further, the bad-faith standard applied by the UDRP panel differs from the standard set out in 15 U.S.C. § 1125(d)(1)(A). *Compare* 15 U.S.C. § 1125(d)(1)(A)(i), (B)(i), *with* UDRP ¶ 4(b), ICANN.org, www.icann.org/resources/pages/policy-2012-02-25-en (last visited Jan. 23, 2018). Although § 1125(d)(1) requires domain-name registrants to have "a bad faith intent to profit," the UDRP policy's definition of "bad faith" appears to be broader—

28

without necessarily requiring any intent to profit.  *Id.*; *see also Sporty's Farm*, 202

F.3d at 499 n.13 ("We expressly note that 'bad faith intent to profit' are terms of art

in the ACPA and hence should not necessarily be equated with 'bad faith' in other

contexts.").

The present record fails to demonstrate that Wang acted with a "bad faith

intent to profit."  *See* 15 U.S.C. § 1125(d)(1)(A)(i).  Even assuming that Wang

prepared his first blog post to bolster his claim that he was an aspiring opera and

arts blogger, this fact does not demonstrate that Wang registered or used the

domain name for commercial gain at defendants' expense.  Wang's website may

have sat dormant until after the UDRP proceedings began, but he had only

registered the domain name 19 days before the UDRP complaint was filed.  Defs.'

Findings at 3–4 ¶¶ 11, 18.  Although defendants emphasize that Wang never

updated his website after his initial post, the lack of activity is unsurprising given

that the commencement of the UDRP proceeding put his ownership of the domain

name in jeopardy and that the UDRP panel ordered that the domain name be

transferred to defendants.[15]  In short, defendants have simply failed to present any

evidence to contradict Wang's assertions that he registered <lefigaro.news> to start

an opera and arts blog without any intent to profit in bad faith at defendants'

expense.

---

[15] As discussed above, the parties dispute whether the UDRP panel's transfer order
took effect.  *See supra* at 9–10.  Yet even if the transfer order was not implemented,
there is no evidence to contradict Wang's representation that he believed it had
been implemented such that the domain name was transferred out of his control.

This case is thus outside the "ACPA's heartland." *See New World*, 150 F. Supp. 3d at 325 (citation omitted).  Defendants have not suggested that Wang sought to sell <lefigaro.news> to defendants at an "exorbitant price." *See id.*  Nor is there any evidence that Wang attempted to divert *Le Figaro* readers to his own website for commercial gain. *See id.*

Nevertheless, in the interest of completeness, the Court will examine the nine "bad faith" factors enumerated in 15 U.S.C. § 1125(d)(1)(B)(i).  At least five of the nine factors are admittedly of no help to Wang.  Given that Wang's blog was such a short-lived project, however, it is unsurprising that Wang cannot demonstrate "trademark or other intellectual property rights" in the domain name (factor I); "prior use" of "the domain name in connection with the bona fide offering of any goods or services" (factor III); or "bona fide noncommercial or fair use of the mark in a site accessible under the domain name" (factor IV). *See* 15 U.S.C. § 1125(d)(1)(B)(i)(I)–(IV).  Factor II (which concerns "the extent to which the domain name consists of the . . . name of the" domain-name registrant) might help a domain-name registrant establish good faith when the domain name includes a personal name that matches his own name.  15 U.S.C. § 1125(d)(1)(B)(i)(II).  The absence of this factor here, however, does little to persuade the Court that Wang acted in bad faith.  Finally, factor IX appears to weigh against Wang given that the "Le Figaro" mark's registration with the U.S. Patent and Trademark Office makes it presumptively distinctive. *See, e.g.*, *Alpha Recycling*, 2016 WL 1178774, at *3.

The remaining four factors are favorable to Wang.  Specifically, there is no evidence of Wang's "intent to divert consumers from the mark owner's online location to a[nother] site . . . for commercial gain or . . . to tarnish or disparage the mark" (factor V); no evidence of Wang's "offer to . . . sell . . . the domain name . . . for financial gain without" intending "to use, the domain name in the bona fide offering of any goods or services" (factor VI); no evidence of Wang's use of "false contact information when applying for the registration of the domain name" (factor VII); and no evidence of Wang's "registration or acquisition of multiple domain names which [he knew were] identical or confusingly similar to marks of others" (factor VIII).  15 U.S.C. § 1125(d)(1)(B)(i)(V–VIII).

Even though many of the enumerated factors do not tip in Wang's favor, the Court takes a "case-specific approach to bad faith" and concludes that Wang has articulated a legitimate, good-faith basis for registering <lefigaro.news>, and evidence that he had a "bad faith intent to profit" from the domain name is absent from the record.  *See Gioconda*, 941 F. Supp. 2d at 433.  For this reason, the Court concludes that Wang's registration and use of <lefigaro.news> did not violate the ACPA's prohibition on cybersquatting, as the bad-faith element of an ACPA cybersquatting claim is unmet.  *See* 15 U.S.C. § 1125(d)(1)(A)(i).  Consequently, the fourth (and final) element of Wang's claim of reverse domain-name hijacking under subsection (v) is satisfied, as Wang's registration and use of <lefigaro.news> was "not unlawful" under the ACPA.  15 U.S.C. § 1114(2)(D)(v).

31

### b.      Reverse Domain-Name Hijacking Under § 1114(2)(D)(iv)

### i.      Legal Standard

Wang also asserts a claim of reverse domain-name hijacking under 15 U.S.C.

§ 1114(2)(D)(iv) on the ground that defendants knowingly and materially

misrepresented facts during the UDRP arbitration to gain control of

<lefigaro.news>.  Compl. ¶¶ 5, 32, 51–52.  Under subsection (iv), a domain-name

registrant can recover damages if an overreaching trademark owner deprives the

registrant of his domain name by means of a knowing and material

misrepresentation in a UDRP proceeding.  *See, e.g.*, *ISystems v. Spark Networks,*

*Ltd.*, No. 10-10905, 2012 WL 3101672, at *2 (5th Cir. Mar. 21, 2012).  Specifically,

subsection (iv) provides as follows:

> If a registrar, registry, or other registration authority takes an action
> . . . based on a knowing and material misrepresentation by any other
> person that a domain name is identical to, confusingly similar to, or
> dilutive of a mark, the person making the knowing and material
> misrepresentation shall be liable for any damages, including costs and
> attorney's fees, incurred by the domain name registrant as a result of
> such action.  The court may also grant injunctive relief to the domain
> name registrant, including the reactivation of the domain name or the
> transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(iv).  Courts have interpreted the word "action" to include the

act of "'transferring, temporarily disabling, or permanently canceling a domain

name' . . . in compliance with a . . . policy . . . such as the UDRP."  *Gen. Media*, 2007

WL 102988, at *7 (quoting 15 U.S.C. § 1114(2)(D)(ii)).  A plaintiff making a

successful claim of reverse domain-name hijacking under subsection (iv) is entitled

"any damages, including costs and attorney's fees, incurred by the domain name

registrant" as well as "injunctive relief . . . , including the reactivation of the domain name or the transfer of the domain name to the domain name registrant."  15 U.S.C. § 1114(2)(D)(iv).[16]

### ii.    Application

Wang contends that defendants "provided the UDRP panel with false, incomplete, and misleading information in connection with its effort to gain control over the <lefigaro.news> domain name."  Compl. ¶ 51.  Wang appears to have three alleged misrepresentations in mind, but none of them satisfies § 1114(2)(D)(iv).

First, according to Wang, defendants misrepresented that he was aware of Société du Figaro's "Le Figaro" trademark when he registered <lefigaro.news>.  Compl. ¶ 33.  In its UDRP complaint, Société du Figaro had argued that Wang was "necessarily aware" of its trademark because "the trademark LE FIGARO® [had been] registered in the TradeMark ClearingHouse" when Wang registered the domain name.  UDRP Complaint, Defs.' Decl. Ex. R, Dkt. No. 29-19, at 2.  The UDRP panel, however, specifically noted that it did not take this argument "into account" in its decision, finding it to be not "clearly argued or properly substantiated."  Panel Decision at 6.  Consequently, Wang cannot plausibly contend

---

[16] As noted, in the context of § 1114(2)(D)(v), the Second Circuit has concluded that the statute is applicable even when "a UDRP panel . . has ordered transfer or deactivation, but in which the order has not yet been implemented" pending the resolution of a subsequent lawsuit.  *Storey*, 347 F.3d at 383 n.11.  This interpretation would appear to apply equally to § 1114(2)(D)(iv) claims, and defendants do not argue otherwise.  It is unnecessary to decide this question here, however, given that Wang's claim under subsection (iv) fails for separate reasons discussed below.

that his domain name was transferred "based on" this representation, or that this alleged misrepresentation "was material." 15 U.S.C. § 1114(2)(D)(iv). Further, Wang has not demonstrated that defendants made this statement "knowing" it to be false (to the extent that it is false). *Id.* For these reasons, this alleged misrepresentation does not support a claim of reverse domain-name hijacking under subsection (iv).

Second, Wang states that defendants misrepresented to the UDRP panel that the newspaper *Le Figaro* was founded in 1826 when, in his view, it was founded more than 100 years later. Compl. ¶ 33; *see also* Panel Decision at 3. Wang cites Société du Figaro's "articles of incorporation," which he says indicate that Société du Figaro was incorporated in 1954. Compl. ¶ 34. However, even if Société du Figaro (*Le Figaro*'s current owner) was incorporated in 1954, the newspaper could have still been established in 1826. Indeed, defendants have submitted a sworn declaration from a chief legal officer of Société du Figaro's parent company attesting to *Le Figaro*'s 1826 founding. Defs.' Decl. ¶ 4. Wang has not submitted any evidence to rebut this sworn statement—much less to demonstrate that defendants "knowingly" misrepresented the date of the newspaper's founding to the UDRP panel. 15 U.S.C. § 1114(2)(D)(iv). Moreover, the date of the newspaper's founding does not appear to be a "material" fact and there is no indication that the panel's decision to transfer the domain name was "based on" the newspaper's alleged 19th century roots. *Id.* For these reasons, the Court concludes that this representation does not support Wang's subsection (iv) claim.

Finally, Wang take issue with defendants' claims of trademark rights dating back before 1958—the year in which "the constitution of modern day France was established." Compl. ¶ 35. Such trademarks, according to Wang, "carr[y] no weight." *Id.* Yet Wang has not cited any authority for this proposition—let alone has he established that defendants "knowingly" misrepresented the validity of their trademarks in the UDRP proceeding. 15 U.S.C. § 1114(2)(D)(iv). For these reasons, the Court concludes that Wang has failed to demonstrate that he is entitled to relief for his claim of reverse domain-name hijacking under subsection (iv).

## C.    Relief

### 1.    Equitable Relief

Although other provisions of the ACPA authorize monetary damages, Wang has only established a claim of reverse domain-name hijacking under 15 U.S.C. § 1114(2)(D)(v) and this statutory provision provides only for "injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant." 15 U.S.C. § 1114(2)(D)(v). Additionally, courts have interpreted this subsection to allow parties to seek a declaration "that the registration of a particular domain name 'is not unlawful under' the ACPA." *Stephens*, 205 F. Supp. 3d at 312; *Smith v. Dir.'s Choice, LLC*, No. 15-CV-81 (JBS) (AMD), 2015 WL 7720482, at *2 (D.N.J. Nov. 30, 2015) ("If the plaintiff can prove that his registration or use of the domain name is not unlawful . . . , he is entitled to declaratory relief and an injunction requiring the registrar to reactivate or transfer the domain name back to the domain name registrant.").

35

Defendants acknowledge as much.  *See* Defs.' Findings at 21 ¶ 46 ("The ACPA authorizes declaratory and injunctive relief in reverse domain name hijacking claims.").

As relevant here, Wang requests (1) a declaration that his "registration and use of the domain name <lefigaro.news> is not unlawful" under the ACPA; (2) a declaration that his registration and use of <lefigaro.news> is "lawful" generally; (3) a declaration that he "is not required to transfer the registration for . . . <lefigaro.news> to" defendants; (4) "a permanent injunction enjoining the [domain-name] registrar from transferring <lefigaro.news>" to defendants; and (5) a "permanent injunction enjoining" defendants from accepting "a transfer of the domain name <lefigaro.news> or claiming ownership" of it.  Compl. "Wherefore" clause ¶¶ A–E; *see also* Pl's Findings ¶¶ III(A)–(E).[17]

Defendants argue that Wang is ineligible for equitable relief on the basis that he has not come to the court with "clean hands."  Defs.' Findings at 21–22 ¶ 47 (quoting *Ricks*, 727 F. Supp. 2d at 965); *see, e.g.*, *United States v. Milstein*, 401 F.3d 53, 64 (2d Cir. 2005) ("As the Supreme Court has explained, '[t]he equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.'") (quoting *Bein v.*

---

[17] Although Wang appears to request declaratory relief under both the ACPA and the Declaratory Judgment Act, 28 U.S.C. § 2201, the Declaratory Judgment Act "is largely irrelevant to this case because the ACPA itself authorizes declaratory relief." *Sallen*, 273 F.3d at 25 n.12; *Stephens*, 205 F. Supp. 3d at 312 (noting that the ACPA "contemplates declaratory actions that the registration of a particular domain name 'is not unlawful'") (quoting 15 U.S.C. § 1114(2)(D)(v)).

*Heath*, 47 U.S. 228, 246–47 (1848)); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) ("[H]e who comes into equity must come with clean hands.") (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 809 (1945)).  Specifically, defendants contend that "Wang's hands are anything but clean" given that his blog entry was "manufactured" evidence and that he intended only to use the domain name for "rent-seeking," not for a Mozart-inspired opera and arts blog.  Defs.' Findings at 22 ¶ 48 (quoting Panel Decision at 6).  The Court, however, has already rejected these arguments as unsubstantiated when rejecting the notion that Wang acted with a "bad faith intent to profit." Consequently, the Court concludes that Wang is not precluded from seeking equitable relief under § 1114(2)(D)(v).

### a.   Declaratory Relief

Concerning the declaratory relief sought by Wang, the Court recommends that a declaratory judgment be entered stating that Wang's use and registration of the <lefigaro.news> domain name did not violate the ACPA's prohibition on cybersquatting.  *See* Compl. "Wherefore" clause ¶ A; 15 U.S.C. § 1125(d)(1)(A); *Storey*, 347 F.3d at 382 ("agree[ing] with the First and Fourth Circuits that a claim brought by a domain name registrant under § 1114(2)(D)(v) seeks a declaration of nonviolation of the ACPA") (internal quotation marks omitted).

The Court, however, recommends against granting Wang's request for a declaration that his registration and use of the domain name was "lawful" more generally.  *See* Compl. "Wherefore" clause ¶ B.  The Court has no reason to question

the broader legality of Wang's registration and use of the domain name.  At the same time, only specific provisions of the ACPA are at issue in this lawsuit. Consequently, the Court recommends against any sweeping pronouncements of legality as such relief would not be narrowly tailored.  *See McClain ex rel. McClain v. Halter*, No. 99-CV-3236 (VM) (JCF), 2001 WL 619177, at *1 (S.D.N.Y. June 5, 2001) ("In exercising its equitable powers, a court must fashion a remedy narrowly tailored to provide the necessary relief.").

Furthermore, given Wang's representation (which appears to be well supported) that the domain name has already been transferred to Société du Figaro, it is unclear why he requests a declaration that he not be required to transfer the domain name.  Compl. "Wherefore" clause ¶ C; Pl.'s Reply ¶¶ 7–9; *see also* Email, dated Dec. 5, 2015, Defs.' Decl. Ex. S, Dkt. No. 29-20 (email from Name.com representative stating that the "domain has been transferred to the Name.com account you provided to us").  In addition, another individual has apparently registered the domain name at issue in this litigation.  *See* Defendants' Aug. 3, 2017 Ltr., Ex. A.  While it thus appears that any relief with respect to the transfer of the domain name may well be moot, the Court recommends, in an abundance of caution, that a declaratory judgment be entered that Wang is not required to transfer the domain name to defendants.

### b.    Injunctive Relief

Concerning the injunctive relief sought by Wang, the Court recommends that none be imposed.  "[A] plaintiff seeking a permanent injunction must satisfy a four-

factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "The Court may issue a permanent injunction in the context of a default judgment where these requirements are met." *CrossFit, Inc. v. 2XR Fit Sys., LLC*, No. 2:13-CV-1108 (KM), 2014 WL 972158, at *9 (D.N.J. Mar. 11, 2014); *see also Hilton v. Int'l Perfume Palace, Inc.*, No. 12-CV-5074 (JFB) (GRB), 2013 WL 5676582, at *12 (E.D.N.Y. Oct. 17, 2013).

A court "has broad discretion to fashion" injunctive relief.  *Beastie Boys v. Monster Energy Co.*, 87 F. Supp. 3d 672, 680 (S.D.N.Y. 2015).  Yet "[i]njunctive relief should be narrowly tailored to fit specific legal violations." *Patsy's Brand. Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003) (quoting *Waldman Publ'g Corp. v. Landoll Inc.*, 43 F.3d 775, 785 (2d Cir. 1984)).  That is, "injunctive relief should be no broader than necessary to cure the effects of the harm caused by the violation, and should not impose unnecessary burdens on lawful activity." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) (internal citations and quotation marks omitted).

Wang requests "a permanent injunction enjoining the [domain-name] registrar from transferring <lefigaro.news>" to defendants.  Compl. "Wherefore"

clause ¶ D.  But the domain-name registrar (Name.com) is not a party to this action.

"In general, a court may not issue an [injunctive] order against a nonparty."

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, No. 11-CV-99 (JGM), 2013 WL

121016, at *2 (D. Vt. Jan. 9, 2013) (citing *United States v. Regan*, 858 F.2d 115, 120

(2d Cir. 1988)).  That said, Rule 65 of the Federal Rules of Civil Procedure provides

that non-parties "who are in active concert or participation" with a party may be

enjoined by an injunction.  Fed. R. Civ. P. 65(d)(2).  This rule "originates from 'the

common law doctrine that a decree of injunction not only binds the parties . . . but

also those identified with them in interest, in 'privity' with them, represented by

them or subject to their control.'"  *U.S. Commodity Futures Trading Comm'n v.*

*Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 334–35 (S.D.N.Y. 2007) (quoting

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).  Wang has pleaded no facts to

establish that Name.com is in privity with defendants such that it could be subject

to a permanent injunction issued in this case.  Thus, the Court recommends against

permanently enjoining Name.com from effectuating such a transfer.

Wang also requests a "permanent injunction enjoining" defendants from

accepting "a transfer of the domain name <lefigaro.news> or claiming ownership"

over it.  Compl. "Wherefore" clause ¶ E.  As a threshold matter, as discussed

previously, this request may well be moot in that defendants themselves have

brought to the Court's attention the fact that an individual not affiliated with any of

the parties has recently registered the domain name at issue in the case.  Given

that the domain name appears to be in someone else's hands, defendants could not

even accept a transfer (and they do not appear to be claiming ownership since they have not reported as much to the Court).

Moreover, even if the domain name had not been registered by someone else, the injunction that Wang seeks is overbroad and potentially would "impose unnecessary burdens on lawful activity." *Church & Dwight*, 843 F.3d at 72.  If, for example, Wang had retained possession of the domain name and then abandoned it in the future, it is unclear why defendants should not in those (hypothetical) circumstances be permitted to claim ownership of it.  Accordingly, the Court recommends against permanently enjoining defendants from ever accepting a transfer of <lefigaro.news> or from claiming ownership over it.

On the present record then, the Court does not believe that a permanent injunction is necessary.  A declaration that Wang has not violated the ACPA's anticybersquatting provision should be sufficient to dissuade defendants from attempting to reacquire <lefigaro.news> from Wang (to the extent he ever seeks again to register it), provided that were Wang to use the domain name again he would do so in good faith without attempting to profit at defendants' expense.  *See Wooley v. Maynard*, 430 U.S. 705, 711 (1977) ("[A] district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary.") (internal quotation marks omitted).

41

### 2.    Monetary Relief

In addition to injunctive and declaratory relief, Wang has requested monetary damages, attorney's fees, and costs.  Compl. "Wherefore" clause ¶¶ F–H. As discussed above, however, Wang has only established that he is entitled to relief under 15 U.S.C. § 1114(2)(D)(v), and that statutory provision does not authorize monetary relief.  To the extent that Wang argues otherwise, the Court notes that where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).  Because other provisions of the ACPA expressly provide for monetary damages and § 1114(2)(D)(v) does not, the Court concludes that this omission was intentional.  *See id.*; *Volovnik v. Benzel-Busch Motor Car Corp.*, No. 09-CV-10595 (DAB) (JLC), 2010 WL 3629819, at *9 (S.D.N.Y. July 29, 2010) (applying the maxim of *expressio unius est exclusio alterius* ["the express mention of one thing excludes all others"] to damages question), *adopted by*, 2010 WL 3629815 (S.D.N.Y. Sept. 16, 2010).

Moreover, even if monetary relief were available for § 1114(2)(D)(v) claims, Wang has not offered any evidence of damages that he has suffered on account of defendants' actions.  Wang has not established, for example, that he has lost advertising or sales revenue because of the UDRP order.  Nor has he demonstrated that defendants profited from their acquisition of the <lefigaro.news> domain name. Consequently, the Court recommends against any award of monetary damages.

42

Furthermore, although Wang requests statutory damages under 15 U.S.C. § 1117, such relief is available for claims of cybersquatting under 15 U.S.C. § 1125(d)(1), not claims of reverse domain-name hijacking under 15 U.S.C. § 1114(2)(D)(v).  Compl. "Wherefore" clause ¶ H; 15 U.S.C. § 1117(d).  Here, Wang has failed to establish a claim of cybersquatting under § 1125(d)(1), making him ineligible for statutory damages under 15 U.S.C. § 1117(d).  *See supra* at 13–14.[18]

Finally, Wang requests attorneys' fees and costs.  Compl. "Wherefore" clause ¶ G.  However, 15 U.S.C. § 1114(2)(D)(v) does not authorize such relief.  Moreover, Wang would be ineligible for this relief even if it were theoretically available.  Because Wang is proceeding *pro se*, he has not incurred attorney's fees.  *See, e.g.*, *Roberts v. Phillips*, No. 06-CV-2866 (LAP) (THK), 2009 WL 3241525, at *4 (S.D.N.Y. Sept. 30, 2009) ("Plaintiff's application for attorney's fees is denied because he is appearing *pro se*, and his application for costs is denied because the Court granted his request to proceed *in forma pauperis*.").  Further, Wang has offered no evidence of costs, which may owe to his *in forma pauperis* status.  *See, e.g.*, *id.*; *Pena v. Comm'r of Soc. Sec.*, No. 08-CV-3304 (NGG) (JO), 2011 WL 2837409, at *1 (E.D.N.Y. July 13, 2011) (denying "request for costs because Plaintiff was granted in-forma-pauperis status").  Thus, the Court recommends against an award of fees or costs.

---

[18] Although the statute does not expressly provide for them, Wang appears to request punitive damages under 15 U.S.C. § 1117(d).  Pl.'s Mem. at 9.  Even assuming that punitive damages are available under this statutory provision, Wang is not entitled to any such relief given his failure to establish a cybersquatting claim under § 1125(d)(1), which is a prerequisite to recovery under § 1117(d).  Thus, the Court recommends against awarding Wang punitive damages.

### III.   <u>CONCLUSION</u>

For the reasons discussed above, the Court recommends that a declaratory judgment be entered stating that Wang's use and registration of the <lefigaro.news> domain name did not violate the ACPA's prohibition on cybersquatting, and that Wang is not required to transfer the domain name to defendants, but that no other relief, injunctive or monetary in nature, be granted.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Engelmayer.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,*

*Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated:      New York, New York
            January 26, 2018


JAMES L. COTT
United States Magistrate Judge


**A copy of this Report & Recommendation has been sent to:**

Raymond Wang
237 West 131 Street
New York, NY 10027

rwnycs@gmail.com